THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
REGGIE E. MILES, Defendant-Appellant.

Fourth District    No. 4—90—0513

Opinion filed August 6, 1991.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

A Vermilion County jury convicted the defendant of two counts of home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11), five counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—14(a)(1)), one count of criminal sexual assault (Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(1)), one count of aggravated unlawful restraint (Ill. Rev. Stat. 1989, ch. 38, par. 10—3.1), one count of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a)), and two counts of residential burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—3(a)). On appeal, the defendant challenges the admission of deoxyribonucleic acid (DNA) evidence and population statistics, trial counsel's effectiveness, jury instructions, and the sentences imposed. We affirm the convictions but remand for resentencing.

The victim, G.S., an adult, African-American female living alone in her home in Danville, Illinois, testified she was sleeping at 2:30 a.m. on November 3, 1987, when she heard a noise. She believed someone was in the house and she was trying to leave when the front door burst open, and a man entered and knocked her down. G.S. was not wearing her eyeglasses and could not see the man. She has never

been able to identify the assailant because she is unable to see clearly without her glasses, and he prevented her from getting to them. G.S. could only tell police the assailant was an African-American male, approximately 5 feet 9 inches or 5 feet 10 inches tall, weighing 160 to 170 pounds.

The man searched the house for other occupants. He then picked up a kitchen knife and held it to G.S.'s throat. He took her to a bedroom and blindfolded her. During the next six hours, the intruder threatened to kill G.S. at least eight times. He sexually assaulted her twice (she testified there was vaginal penetration each time) and struck her at least five times. He ransacked her home, taking money and jewelry. He drove G.S., in her car, to an Easy Answer automatic teller machine and forced her to withdraw $200 from her checking account.

Upon returning to G.S.'s home, the intruder found G.S.'s savings account passbook. He allowed her to shower and dress and returned her eyeglasses to her, covered with duct tape. G.S. testified she kept duct tape in her utility room. He then drove her to her bank, Palmer Bank, in her car, and forced her to withdraw the $2,000 she had in her savings account. Business was transacted at a drive-up window. G.S. testified the man held a knife between her legs and threatened to use it if she did anything strange while at the bank. Her car had tinted windows.

After leaving the bank, the assailant drove a distance and stopped the car. He told G.S. he had to kill her; she pleaded for her life. The intruder suddenly jumped out of the car and ran. G.S. found another pair of her eyeglasses in the backseat of her car and went for help.

On cross-examination, G.S. testified she could not recall whether the defendant ejaculated during either sexual assault. She did not believe she could identify the defendant's voice.

Tammy Rife, a teller at Palmer Bank, testified she was on duty at the drive-up window on November 3, 1987. A car pulled up to the window shortly after 8:30 a.m. She informed the occupants the bank did not open until 9 a.m. The male driver of the car told her they would wait. Rife did not know either occupant. She remembered the car had tinted windows. She talked only to the male driver. The female occupant kept her head down during the entire transaction and did not speak. Rife recorded the car's license plate number as it was leaving, because she felt something was wrong, particularly since the female occupant was withdrawing all the money in her savings account and did not look up or talk. Rife could not identify the defendant.

John Deltuva, a Danville, Illinois, police officer, testified he spoke with G.S. at around 9:52 a.m. on November 3, 1987, and accompanied her to her house to investigate. He found a screen on a window of the screened front porch pulled out, the front door to the house open, and the front-door frame smashed. In the house, he found closet doors and drawers open and various articles strewn on the floors of each room.

Sergeant Bob Richard, of the Danville police department, testified he was the major crime scene supervisor for the department on November 3, 1987. He was present when the victim's car was processed for fingerprints and went to G.S.'s house to lift fingerprints. At the house he saw a window and its frame, on the screened front porch, pulled out. The front door to the house had been forced open; the doorjamb around the deadbolt, which was still engaged, was splintered and the molding knocked to the floor. Three telephones were on the couch in the living room. The wires had been cut on two of the telephones, one was still connected. Richard found latent fingerprints on the window frame that had been pulled out, the window, the telephones, and the glass closet doors in G.S.'s bedroom. He also found a two-liter grape Crush soda bottle in G.S.'s bedroom, on a table next to her bed. He lifted and preserved more than 20 latent fingerprints at G.S.'s house.

Kevin Horath, a forensic scientist with the Illinois State Police, received evidence from Sergeant Richard, including 29 latent fingerprint lifts. He identified the defendant's fingerprints on one of the telephones, a storm window, the inside of a porch window, and the grape Crush soda bottle.

William Frank, a forensic scientist with the Illinois State Police and DNA research coordinator for the State Police, received a sexual assault kit on November 22, 1988. He found no seminal material on any of the swabs in the kit. He found seminal stains on the bottom sheet police removed from the bed in G.S.'s bedroom, the site of one of the sexual assaults. After requesting additional samples from the defendant and G.S., Frank determined the defendant and G.S. have different blood types. On July 20, 1989, at a hearing on bail, the defendant requested DNA testing and expressed no objection to the taking of hair and blood samples.

Larry Thomason, a Danville police investigator, took G.S.'s statement on November 3, 1987, and recovered various items of evidence from her home. On July 18, 1989, he talked with the defendant, who was in prison, about a home invasion which occurred on November 3, 1987. The defendant denied committing the crime. The defendant had been sentenced to imprisonment on November 10, 1987.

The State then began its presentation of DNA evidence. The State called Lisa Foreman, a Ph.D. research scientist at Cellmark Diagnostics (Cellmark), a DNA identification company in Germantown, Maryland. After presenting her credentials, Foreman explained DNA stands for deoxyribonucleic acid, an organic substance found in chromosomes, which are located in the center or nucleus of cells. DNA carries genetic instructions. The instructions, or genetic code, are expressed in the form of four building blocks and in the arrangement of the blocks. The blocks are called bases, each with a different name. DNA is shaped like a ladder; each rung of the ladder has two bases. There are DNA ladders in each nucleated cell in each person. If strung out end to end, the ladder would have 3.3 billion rungs. Of the 3.3 billion rungs of a DNA ladder in each cell, no two people are alike except for identical twins. The differences in the rungs on the DNA ladders account for the differences between individuals.

Foreman defined forensic testing or DNA identification as:

> "a method of examining an individual and prying out, teasing out parts of the DNA where individuals tend to be different from one another. So it is a method of using the genetic markers that we can identify as distinctive from one individual to the next and using that information to uniquely identify an individual on the basis of their DNA."

Foreman testified there is general consensus in the scientific community supporting the conclusion DNA forensic testing produces reliable results.

DNA forensic testing is used to determine the likelihood a sample of blood, tissue, or sperm came from a given person. Summarized in general terms, the process of DNA forensic testing is as follows. The laboratory begins with a sample of blood, hair, sperm, saliva, or any sample containing cells with DNA. The cell is opened and the chromosomes and the proteins which tightly bind the DNA are flushed away. This process is known as DNA extraction. The DNA ladder with its 3.3 billion rungs remains. The ladder must be shortened, however, to cope with the information it provides. Thus the DNA is then cut into random fragments using a restriction enzyme. The enzyme recognizes specific sequences of the DNA code and each time it sees a particular sequence, it cuts the DNA ladder. The DNA fragments are then "run out" on an agarose "jell," a piece of gelatin substance to which the DNA is applied so it can be charged with an electrical current. The DNA sorts itself out by size after electricity has been applied, and small fragments pass through the "jell" matrix.

The next step is denaturization, where the ladder is cut in half down the middle and the two bases are separated. Hydrogen bonds the two bases on each rung of the ladder and the bond is broken by adding sodium hydroxide. This leaves single strands of DNA frozen in the "jell" matrix, all sorted by size. The information on the "jell" is transferred to a nylon or a special membrane which looks like a piece of paper. This enables scientists to repeatedly examine the DNA. This process is known as Southern blotting. Next, the scientist must determine where in the DNA sample the information needed resides. A DNA probe or series of probes is applied to the membrane. According to Foreman:

> "A DNA probe is simply a piece of DNA that you are interested in. That's all it is.
>
> In our case we're interested in pieces of DNA that allow us to individualize one person as distinct from another person. So we take a probe, a piece of DNA that is completely known to us, we know on what chromosome it resides, we know what its sequence is, we know everything about it, except what it looks like in each individual person, and we send that probe to the membrane. We radioactively label the probe so we can visualize it. We power it over the membrane and let it look for its complimentary [sic] sequence in our questioned sample."

Excess probe, the probe that is not 100% complementary with the bases on the membrane, is then washed away and the membrane is exposed to a piece of X-ray film. Wherever the radioactive probe has found a complementary sequence, a black mark appears on the X ray. The X-ray film is developed and the result is known as an autoradiograph or, more commonly, an autorad.

Foreman testified the procedure described above is currently recognized and accepted within the scientific community:

> "All of the procedures that are used in DNA analysis for identification purposes are cornerstone procedures that are relied upon in all areas of molecular biology including diagnostics and clinical applications.
>
> The part that is somewhat different from the previous use of genetic markers in forensic application is the sensitivity of the markers, the probes that are being used to uniquely identify one person as distinct from another."

Foreman then described the procedure for visually assessing the autorads to determine if there is a DNA match, a process which compares the known standard to a sample. This area of scientific endeavor is known as population genetics.

The procedures Foreman described are used, according to her, not only by Cellmark but also by the Federal Bureau of Investigation (FBI), Life Codes Corporation (another DNA identification company), and all State and local crime laboratories performing DNA research. Foreman then described Cellmark's quality control and assurance procedures and explained the methods for verifying a DNA match.

On cross-examination, counsel questioned Foreman on Cellmark's procedures for gathering samples for its data bases. Foreman presented additional general testimony regarding DNA testing and the methods by which the experiments were conducted.

Court and counsel then conducted a side-bar conference in which the defendant objected to the State's offer of Foreman as an expert and to further evidence on DNA testing: "[M]y objection at this stage of the proceedings is that the scientific principles on the DNA testing are not sufficiently well established to meet the test of [*Frye v. United States* (D.C. Cir. 1923), 293 F. 1013,] as adopted by the Illinois Courts." The defendant also objected to the application of the "product rule":

> "I would further \*\*\* make an objection to any testimony concerning the application of the product rule in this particular case, which I expect based upon was discosed [*sic*] to the Court, to me, and Mr. DeArmond yesterday, will be testimony to the effect that Mr. Miles can be included in a population group of one in 280,000 blacks in the United States who could have donated the semen sample at issue here. \*\*\* I believe there is case authority in Illinois, which provides that even if it might be technically or scientifically correct to recite such odds or such testimony that can in certain instances be too prejudicial for the jury in that the jury may over emphasize [*sic*] such testimony."

The court overruled the objections and qualified Foreman as an expert.

Mark Boodee, formerly a molecular biologist at Cellmark, testified Cellmark's forensic procedures are commonly recognized and accepted within the molecular biology profession. Defense counsel objected to Boodee's giving a scientific opinion or conclusion regarding tests he performed in this case, but the court overruled the objection.

Boodee testified Cellmark maintains the physical integrity of evidence samples by storing the evidence behind "at least three or four locked doors from the outside." The sample was stored at four degrees celsius. He indicated samples left at room temperature can be eroded by bacteria. Boodee received a piece of a bed sheet from Ser-

geant Richard on November 2, 1989, and a letter indicating the race of the defendant and G.S. Cellmark needed race information in order to compare the sample to the appropriate data base.

Boodee began the forensic process by separating the DNA of the suspect from the DNA of the victim, a process known as differential analysis. He then determined the quantity and quality of DNA present in the bed-sheet sample prior to cutting the DNA. Boodee contacted Sergeant Richard and requested blood samples from defendant and G.S. These samples were compared with the results of the bed-sheet tests. Boodee explained the procedures performed on the blood samples to extract the DNA. The bed-sheet samples never came into contact with the blood samples.

The first step in comparing the bed-sheet sample with the blood samples was to determine how much DNA was available for analysis, "because we like to have all of our lanes looking exactly the same. If you have too much DNA in one lane and not enough in another lane you're going to have bands which are way blown out of proportion and other bands which you can barely see." Next, Boodee visually assessed the bands on the autorads to identify matches. He found several DNA matches between the bed sheet and the blood sample defendant provided. Boodee then measured the DNA bands using a ruler.

The next step in the comparison process is called bioimaging. A computer photographed the autorads and the computer measured the DNA bands.

> "Q. [Prosecutor:] Based upon your experience, education, and training were you able to form an opinion as to whether you had a match between the stain coming from the bed sheet and the sample from Reggie Miles within a reasonable degree of scientific certainty?
>
> A. [Boodee:] Yes.
>
> Q. And what was that opinion?
>
> A. That the five bands from the bed sheet matched the five bands from Reggie Miles."

Foreman took the stand again and testified she reviewed Boodee's work, a standard practice at Cellmark. She stated her initial review of his work indicated he properly performed the tests. However, while reviewing the case file on the airplane en route to Danville, she discovered computer-generated DNA fragment sizes had accidently, and inappropriately, been compared to hand-measured DNA fragments. She telephoned Cellmark upon arriving in Danville and had the measurements done properly. She determined the frequency of DNA frag-

ments common to both the defendant and the bed sheet was 1 in 300,000. After reviewing Boodee's work and the case file, Foreman opined "the DNA from the bed sheet matches the DNA banding pattern that we found in Mr. Miles and that it is unlikely that that DNA was deposited by someone else."

The State rested.

Jeff Stacker was the first defense witness. He is a cousin of Leon Mason, G.S.'s former husband. He testified he had been to G.S.'s house on several occasions in 1986 to visit Mason and met G.S. there. Stacker is also a friend of the defendant. He and the defendant visited Mason at Mason's home several times during 1986. On cross-examination, he testified he and the defendant were then housed together in the same cell block at the Public Safety Building in Danville. Stacker has several convictions: theft and unlawful use of a weapon in Illinois, grand larceny in New Mexico, and robbery in Wyoming. He was awaiting sentencing in Vermilion County on armed robbery and aggravated battery convictions.

The defendant testified he had known Mason for several years and knew he was, at the time of trial, serving time in a Federal penitentiary. He last saw Mason in 1986, and testified he had been to Mason's home several times in 1986. Mason introduced G.S. to him on one of the visits. The defendant testified his parents, seven brothers and sisters, 11 aunts and uncles, and numerous cousins live in Danville, Illinois.

The defendant denied entering G.S.'s home on November 3, 1987, and raping her. He could not recall where he was on November 3, 1987. Defendant was sentenced to the penitentiary on November 10, 1987, and remained there. He learned he was a suspect in the case involving G.S. in July 1989, when an investigator visited him at the prison and sought to ask questions regarding the incident. The defendant testified he denied being in G.S.'s house.

On cross-examination, the defendant testified he was at Mason's house in March 1986, and the last time he visited there was September 1986. While visiting Mason, the defendant and Stacker cleaned the house, but he denied ever going into the utility room. He claimed he did not know Mason was in Federal custody from March 18, 1986, to July 16, 1988, prior to sentencing to the Federal penitentiary. The defense then rested.

The State called Richard Carroll, a United States probation officer. He testified he prepared a presentence report for Mason in 1986. Mason was taken into custody on March 18, 1986, and has been in Federal custody since then.

The jury returned guilty verdicts and the trial court subsequently denied the defendant's motion for post-trial relief. The court sentenced the defendant to 30 years' imprisonment on count I (home invasion), 30 years' imprisonment on count IV (aggravated criminal sexual assault), 30 years' imprisonment on count X (armed robbery), and 30 years' imprisonment on count XI (residential burglary), the sentences to run consecutively for a total of 120 years' imprisonment. The court imposed an eight-year prison sentence for aggravated unlawful restraint, to run concurrently to the other sentences imposed.

On appeal, the defendant first contends the State failed to present sufficient evidence the techniques used by Cellmark produced a reliable result. Defendant argues the trial court erred in admitting evidence of a DNA match. We begin our analysis by noting the following facts. First, it was the defendant who requested DNA testing. Yet he failed to present an expert witness to challenge the testimony of the State's experts. Additionally, the defendant's fingerprints were found throughout G.S.'s home, most importantly at the point of entry, the window on the porch. G.S. specifically testified she did not drink soda directly from two-liter bottles. Yet Danville police found a two-liter grape Crush soda bottle on a nightstand in G.S.'s bedroom. The defendant's fingerprints were lifted from the bottle.

The defendant does not claim DNA testing fails to meet the standards of *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013. In *People v. Lipscomb* (1991), 215 Ill. App. 3d 413, 432, this court stated:

"[T]he DNA identification or fingerprinting procedure *** is generally accepted within the particular scientific fields involved and is admissible. This includes the six-step RFLP [Restriction Fragment Length Polymorphism] procedure used in developing the autorads, the visual interpretation of these autorads, the manner of determining the bins, the development of frequencies, and [the] procedure whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern.

Any question concerning the specific procedures used by the company or expert goes to the reliability of the evidence and is properly considered by the jury in determining what weight to give to this evidence. If it is shown that the procedures used give an unreliable result, then the court may find it necessary to exclude this evidence entirely."

Foreman testified Cellmark follows the TWIGDAM (Technical Working Group—Interagency Working Group of DNA Methodology) guidelines, promulgated by the FBI. Defendant cites numerous cases

from other States in which Cellmark's testing procedures were found to be so unreliable the results were not admitted into evidence. Most of these cases reached this result after expert witnesses for the defense challenged the procedures. Cellmark, however, appears to be learning from past mistakes, as seen by the company's adoption of a written protocol and adoption of the TWIGDAM standards. We are unpersuaded by the cases defendant cites.

When a case arrives at Cellmark, it is assigned to one person, who is responsible for performing tests and following testing procedures. Cellmark requires its scientists follow a written protocol in performing tests. Expiration dates ensure chemicals used in the processes are fresh. Boodee testified instruments and equipment are kept in working order. A second Cellmark employee witnesses all steps in the chain of custody as well as many test procedures. Once the autorads are developed, the molecular biologist presents them to a Ph.D. scientist for review. The Ph.D. scientist reviews the entire case file in interpreting the autorad. Two Ph.D. scientists separately review each case and each writes a report of findings. The reports are combined in the final document sent to the client. A laboratory supervisor reviews the report before it is released to the client.

Boodee testified he followed Cellmark's protocol in performing DNA tests on the bed sheet and blood samples provided in this case. His work was reviewed by two Ph.D. scientists. Foreman testified the autorads Boodee produced in this case provided "nice quality autoradiographic results."

After examining five separate autorads, Boodee and Foreman indicated the defendant's DNA matched the DNA found in the semen on the bed sheet from G.S.'s house. Computer as well as hand measurements were made in declaring the match.

Boodee specifically stated evidence left at room temperature can be degraded by bacteria. The jury knew the bed sheet had been in an evidence locker in Danville, at room temperature, for two years *before* testing by Cellmark. Boodee testified the semen stain on the bed sheet did provide sufficient DNA for the tests performed. Foreman was forthcoming about the mistake made in measuring the DNA in which hand measurements were inappropriately compared to computer measurements. But she also testified she telephoned Cellmark and had proper comparisons made before trial.

■ The admission of expert testimony is within the trial court's discretion and will not be reversed on appeal absent an abuse of discretion. (*People v. Eyler* (1989), 133 Ill. 2d 173, 211, 549 N.E.2d 268, 285, *cert. denied* (1990), 498 U.S. 881, 112 L. Ed. 2d 174, 111 S. Ct.

215.) Expert testimony is admissible when the expert has knowledge or experience not common to a layman, and this knowledge or experience would aid the jury in determining the facts at issue. *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.

Expert testimony was admissible in this case because DNA identification is beyond the knowledge and experience of laymen. The evidence presented regarding the procedures used in this specific case did not indicate the results produced were clearly or inherently unreliable. The expert witnesses in this case were well-prepared and presented coherent testimony. Defense counsel vigorously cross-examined each witness not only as to general DNA testing procedures but also as to quality-control measures used by Cellmark and problems encountered in this case. We place particular emphasis on the testimony of the expert witnesses, their thorough cross-examination, the written protocol adopted by Cellmark, and the TWIGDAM standards. Given these factors, the trial court properly admitted the DNA match evidence.

The second issue on appeal is whether the trial court erred in admitting expert testimony that the statistical probability of a random match in the African-American community was 1 in 300,000. The general procedure for generating such statistical probabilities begins by comparing the DNA from the evidence, in this case the semen from the bed sheet, to the DNA in the suspect's blood sample, to determine if there is a match. If so, then the suspect's DNA is compared to information in Cellmark's African-American data base to determine the probability of an African-American other than the defendant leaving the semen stain on the bed sheet. Foreman testified the probability was 1 in 300,000.

The data base for African-Americans at Cellmark is the result of DNA testing on 200 to 300 blood samples. The samples came from African-Americans in Detroit, Michigan. Defendant argues the use of the so-called "product rule," which requires Cellmark to multiply "the frequency of occurrence of various [DNA] bands at various loci to produce some large figure representing a small probability of a random match," creates a danger of producing misleading information. The defendant bases his argument on *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734.

The *Harbold* defendant was convicted of murder. At trial, experts testified the victim's blood type was A while the defendant's blood type was O. DNA tests were performed on Type O bloodstains found on various pieces of evidence. The appellate court reluctantly concluded the evidence was admissible, but questioned scientific accept-

ance of the DNA identification process. However, the court concluded expert testimony "that 'the chances of selecting any two people at random from the population and having them accidently have identical blood types in each one of these factors is less than one in 500, that is, what we call the probability of an accidental match is less than one in 500,' " was inadmissible because it was irrelevant, beyond the scope of expert opinion, and highly prejudicial. (*Harbold*, 124 Ill. App. 3d at 381, 464 N.E.2d at 748.) This court's opinion in *Lipscomb* renders *Harbold* inapplicable.

The defendant in *Lipscomb* also relied on *Harbold* in challenging the admission of probability statistics. This court distinguished *Harbold* and found it inapplicable, holding the DNA identification procedure was admissible, including "the development of frequencies, and procedure whereby the individual frequencies are multiplied together to determine the ultimate frequency of the pattern." (*Lipscomb* (1991), 215 Ill. App. 3d at 432.) Implicitly, the court held the process of generating probability statistics is an integral part of the DNA identification process. Because the DNA identification process meets the *Frye* test and is admissible, probability statistics operated thereby are admissible. The trial court did not err in admitting Foreman's calculation that the chances of another African-American male leaving the semen stain found on the bed sheet in G.S.'s bedroom was 1 in 300,000.

In summary, the trial court did not err in admitting the DNA evidence. The standards established by *Lipscomb* were met in this case. Additionally, evidence of defendant's guilt was overwhelming, even without the DNA evidence.

■■ The third issue on appeal involves the effectiveness of trial counsel. The defendant claims trial counsel was ineffective because he did not present an expert witness to challenge testimony by Foreman and Boodee. A defendant seeking to show trial counsel's performance was ineffective must first show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) This requires the defendant show his trial counsel's representation "fell below an objective standard of reasonableness." (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) The defendant has failed to make such a showing in this case. His attorney made proper, timely objections throughout the trial and vigorously cross-examined the State's expert witnesses. Counsel's performance did not fall below

an objective standard of reasonableness; he did the best he could given the overwhelming evidence of his client's guilt.

The second showing defendant must make pursuant to *Strickland* is prejudice; the defendant must show counsel's performance was so deficient it prejudiced him or, "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) It is unlikely the result in this case would have been different even if defense experts had been presented and challenged Foreman and Boodee, given the fingerprint evidence and defendant's lack of credibility. The defendant failed to show ineffective assistance of counsel as required by *Strickland*.

The defendant next contends Federal and State law require reversal of the sexual assault conviction because the jury instructions failed to specify a mental state. The defendant has waived this issue because he failed to object to the instructions given and failed to raise the issue in his post-trial motion. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

The fifth issue on appeal is whether the trial court erred in imposing extended-term sentences for aggravated unlawful restraint and residential burglary. The jury convicted the defendant of three Class X felonies: armed robbery, aggravated criminal sexual assault, and home invasion. The trial court sentenced the defendant to 30 years' imprisonment for each of the Class X felonies. The jury convicted the defendant of residential burglary, a Class 1 felony. The statutory period of imprisonment for a Class 1 felony is 4 to 15 years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(4).) The trial court, however, sentenced the defendant to 30 years' imprisonment for residential burglary, though the court made no finding that defendant was eligible for an extended-term sentence for residential burglary. The jury also convicted the defendant of aggravated unlawful restraint, a Class 3 felony. The statutory period of imprisonment for a Class 3 felony is two to five years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(6).) The court sentenced the defendant to an extended term of eight years for aggravated unlawful restraint. The court concluded this was the only count on which the defendant was eligible for an extended term, "because you have been convicted of that same class or greater felony as proscribed [*sic*] by the statute."

The statute permitting an extended-term sentence states: "A judge shall not sentence an offender to a term of imprisonment in ex-

cess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted ***." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—2(a).) The Illinois Supreme Court has held "the plain language of section 5—8—2(a) requires that, when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class." *Jordan*, 103 Ill. 2d at 206, 469 N.E.2d at 575.

The defendant argues, and the State concedes, the trial court erred in imposing an extended-term sentence for aggravated unlawful restraint, because it was not the most serious offense for which defendant was convicted.

We therefore reverse the sentences imposed on the aggravated unlawful restraint and residential burglary convictions, and remand for resentencing.

The final issue is whether the trial court erred in imposing consecutive sentences for home invasion, armed robbery, and residential burglary. Section 5—8—4(b) of the Unified Code of Corrections (Code) states, in pertinent part:

"(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court.

(b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—4(a), (b).

The court entered separate judgments on aggravated unlawful restraint, armed robbery, and each residential burglary conviction, stating: "The Court in that regard makes that determination based upon the facts in the record, and also based upon the fact that these are separately findable, separately committed offenses; they are not all a

part of the same act, and therefore, separate judgments as indicated are appropriate." In deciding to impose consecutive rather than concurrent sentences, the court specifically stated it relied on section 5—8—4(b) of the Code. The decision to rely on subsection (b) was "based upon [the defendant's] prior record, and the facts and circumstances involved in this case."

In considering the defendant's extensive criminal record, the court did not include traffic and "fine only" offenses. The defendant also had convictions for the following offenses in the years specified: retail theft (1975, and twice in 1987), criminal damage to property (1976), battery (twice in 1978, and in 1982), burglary (1980), theft over (twice in 1980, and in 1982), theft (1982, and again in 1987), forgery (twice in 1982), and possession of a controlled substance and possession of a hypodermic needle (1989). On March 2, 1990, defendant had been sentenced to six years in the Illinois Department of Corrections on another matter, though the presentence report does not indicate the crime(s) for which defendant was sentenced.

The court, in this case, stated: "Your record before the Court indicates a constant and persistent pattern of violations of the law, noncompliance with probation, and non-compliance with the law." The court continued:

> "[A]t this point I think you are a serious risk to the public. I think that the facts and circumstances, and the nature of the offense, and the history of your offenses, and your offenses in this case lead the Court to believe that a term, a consecutive term, and a long consecutive term in the penetentiary [sic] is necessary to protect the public from you. I think you have to be warehoused."

On appeal, the defendant argues the trial court erred in imposing consecutive sentences for armed robbery, residential burglary, and home invasion because the trial court made no finding these offenses were not part of a single course of conduct. He also contends there was no change in the criminal objective, which was entering G.S.'s home to take her property.

Although the trial court specifically relied on subsection (b) and found the defendant should be warehoused, the defendant argues the court cannot circumvent the requirements of subsection (a) merely by finding the public deserves to be protected from him. The defendant concedes a consecutive sentence was proper for aggravated criminal sexual assault.

The defendant relies on *People v. Davis* (1986), 151 Ill. App. 3d 435, 502 N.E.2d 780. In *Davis*, the trial court imposed consecutive

sentences for residential burglary, home invasion, and aggravated criminal sexual assault. The defendant argued the evidence showed one of his motives for entering the victim's house was to commit a sexual assault and, thus, there was no substantial change in his objective with the offenses of home invasion and residential burglary. He argued there was no evidence to support the trial court's conclusion he entered the victim's home and then formed the intent to commit sexual assault. The Second District Appellate Court agreed. "It is equally possible under this evidence that defendant entered [the victim's] home with the intent to commit both a theft and a sexual assault. We conclude the trial court erred in imposing consecutive sentences." *Davis*, 151 Ill. App. 3d at 445, 502 N.E.2d at 787.

The only case which follows the *Davis* holding on consecutive sentencing is *People v. Miller* (1989), 193 Ill. App. 3d 918, 552 N.E.2d 988. One year later the same court, though a different division, limited *Davis* to its facts and called into question the opinion's reliance on *People v. Morgan* (1976), 44 Ill. App. 3d 459, 358 N.E.2d 280. (*People v. Abrams* (1990), 205 Ill. App. 3d 295, 299-302, 562 N.E.2d 613, 615-17.) The *Abrams* court also concluded the Illinois Supreme Court implicitly rejected arguments similar to those made by the defendant in *Davis* in an earlier decision, *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819.

██ The trial court's exercise of discretion in sentencing the defendant should not be disturbed on review in the absence of an abuse of discretion. (*People v. Steppan* (1985), 105 Ill. 2d 310, 323, 473 N.E.2d 1300, 1307; *People v. Tigner* (1990), 194 Ill. App. 3d 600, 609, 551 N.E.2d 304, 310.) The trial court in this case did not abuse its discretion. The court determined consecutive sentences were appropriate because the offenses (home invasion, armed robbery, and residential burglary) were separate offenses *and* because the public needed protection from the defendant. The record supports both conclusions.

When the defendant entered G.S.'s house, he first sought money. He threatened to rape her if she did not cooperate in withdrawing money from the Easy Answer machine. The defendant raped G.S. at knifepoint when they returned to her home, despite her cooperation. He then ransacked the house searching for more objects of value. He fell asleep while waiting for the bank to open and, when G.S. attempted to flee, he raped her again. The original objective, stealing money and jewelry from G.S.'s house, changed when the defendant forced her leave her home to withdraw money from her checking and savings accounts. The objective also changed when he sexually as-

saulted G.S. See generally *People v. Partee* (1987), 157 Ill. App. 3d 231, 511 N.E.2d 1165; *People v. Simmons* (1985), 138 Ill. App. 3d 492, 485 N.E.2d 1135.

Additionally, the record in this case, as well as defendant's criminal background, support the conclusion consecutive sentences were necessary to protect the public. "[T]o hold that under these circumstances consecutive sentences are precluded would be contrary to the deterrent purpose of multiple sentencing, which is to discourage the commission of further offenses once an initial offense has been completed." *People v. Paino* (1985), 137 Ill. App. 3d 645, 654, 484 N.E.2d 1106, 1112.

Affirmed in part; reversed and remanded in part.

GREEN and STEIGMANN, JJ., concur.