ON RETURN TO REMAND
This cause was remanded, 586 So.2d 256 (Ala.Cr.App. 1991) to the trial court, pursuant to the Alabama Supreme Court's decision in Ex parte Perry, 586 So.2d 242 (Ala. 1991). The trial court conducted a two-day hearing to determine the admissibility of both the DNA "matching" evidence and the DNA population frequency statistical evidence. The evidence consisted of the testimony of six expert witnesses: a former forensic scientist with Lifecodes Corporation, the laboratory which performed the DNA testing; the director of forensic science for Lifecodes, who holds a Ph.D. degree in genetics; a professor at Florida International University, who holds a Ph.D. degree in biology; an associate research scientist in the division of biostatistics at Yale University, who holds a Ph.D. degree in botany; a forensic scientist employed by the Alabama Department of Forensic Sciences; and a laboratory director for Analytical Genetic Testing Center, Inc., who holds a Ph.D. degree in human genetics. Following the hearing, the trial court determined that the evidence was properly admitted, and it therefore left the judgment of conviction undisturbed. The trial court returned the following findings of fact and conclusions of law, determined pursuant to the "three-pronged" test adopted by the Alabama Supreme Court.
"I
"DNA Matching Evidence
"Prong I: Theory
 "The Supreme Court of Alabama has found, from the evidence already adduced in trial of this cause, that, as to 'matching' evidence, the theory advanced in this cause is generally accepted in the scientific community and supports the conclusion that DNA testing can produce reliable results. The evidence heard by this court on remand only re-enforces this point, and the evidence is overwhelming on this point, and this court reaffirms that finding.
"Prong II: Techniques *Page 225 
 "The Supreme Court of Alabama also answered this question in this cause in the affirmative, and this court finds from the evidence on remand that the evidence is clear to the conclusion that techniques used by Lifecodes in this cause are capable of producing reliable results and are generally accepted in the scientific community.
 "Prong III: Performance and interpretation of accepted techniques
 "This court finds that the tests conducted by Lifecodes which were testified to in the principal trial of this cause were generally accepted techniques. Further, the testing conducted by Lifecodes was performed without error.
 "There is disagreement between the State's witnesses and the defendant's witness as to whether Lifecodes interpreted the matching evidence correctly. The state of the art at the time the testing was done prior to initial trial of this cause was that the test results could be interpreted as to matching by a visual method only, i.e., by analyzing the film of the respective autorads by the naked eye as to whether there was or was not a 'match.' Subsequent developments in sizing technology provide an additional and more objective test, and that technology was not available in 1988, when the testing testified to in the principal trial was conducted. Even with the advanced technology developed since the 1988 trial, at least one match can be verified, and, using the visual method generally accepted in 1988, the matching evidence presented to the jury by Lifecodes was not misinterpreted. Using post-1988 technology for size measurements, there still is at least one match. The court concludes that there was no error of Lifecodes in interpreting the matching data at the initial trial. Even under present technology, the tolerance or deviation allowance which is standard with Lifecodes, allowing a variance in measurement of 1.8 percent, is stricter than that used by the FBI DNA laboratory or the laboratory of which the defendant's expert witness is director, which are allowances of 2.5 percent and 2 percent respectively.
"II
"Population Frequency Evidence
"Prong I: Theory
 "This court finds that the theory advanced by Lifecodes in the principal trial of this case of computing the frequency of the occurrence in the general population of the particular chromosome groupings was and is a generally accepted one in the scientific community and is recognized as producing reliable results. The compilation of Lifecodes' database and the use of the Hardy-Weinberg formula were and are generally accepted in the scientific community as reliable. This court notes that other jurisdictions, in treating this question, have so found. See Andrews v. State, 533 So.2d 851 (Fla. 1988); Caldwell v. State, 260 Ga. 278, 393 S.E.2d 436
(1990); People v. Miles, 217 Ill. App.3d 393, 160 Ill.Dec. 347, 577 N.E.2d 477 (1991); Hopkins v. State, 579 N.E.2d 1297 (Ind. 1991); State v. Smith, 248 Kan. 217, 807 P.2d 144 (1991); People v. Wesley, 140 Misc.2d 306, 533 N.Y.S.2d 643 (1988); State v. Ford, 301 S.C. 485, 392 S.E.2d 781 (1990); Kelly v. State, 792 S.W.2d 579 (Tex.App. 1990); and Spencer v. Commonwealth, 238 Va. 295, 384 S.E.2d 785 (1989).
"Prong II: Techniques
 "The great weight of the evidence is that the techniques used by Lifecodes in determining population frequency statistics were current techniques in 1988 and are now, and were then and are now generally accepted in the scientific community as capable of producing reliable results. The court answers this inquiry in the affirmative.
 "Prong III: Performance and interpretation of techniques
 "There is no question that Lifecodes here performed the population frequency techniques correctly in 1988, and without error. In fact, its database accumulation since 1988 has added to the accuracy of such frequency estimates. The gradual addition to its database gives *Page 226 
rise to different population frequency estimates as that database broadens, as was noted by the Virginia court in the Spencer case, supra.
 "The problem which arises in applying this prong of the test to the population frequency statistics is that a clerical error occurred in the Lifecodes report of October 1988. In that report, two DNA fragment sizes were juxtaposed, leading to an incorrect interpretation of the results by Dr. Kevin McElfresh, a Lifecodes forensics scientist who testified in the principal trial for the State. In the trial, Dr. McElfresh testified that the probability of finding the same three chromosome groupings in the general population was one in 209,100,000 times. At the hearing on remand, the evidence is that correcting the clerical error leads instead to a population frequency estimate of one in 23,000,000. Thus, there was error in the initial trial in interpretation of the test results.
 "However, in the view of this court, the inquiry does not end here. Two additional probes have been conducted since 1988 which were not available at the time of the original testing, and the autorads of those were introduced in evidence at the hearing on remand. Those probes were conducted on the same specimens which were forwarded to Lifecodes in 1988, and they were conducted in a reliable and generally accepted technique in the scientific community and without error. All witnesses, including the defendant's expert witness, do not dispute the validity of these two additional probes and autorads and do not dispute that the tests producing them were done correctly and accurately. Lifecodes now says that, with results gathered by these two new probes, the correct population frequency statistic is one in 12 billion. The defendant's expert witness, analyzing the results of these two additional probes, testifies to a probability, at the lowest, of one in 300,000,000. This result, taken from the same specimens which were tested prior to initial trial, under current state of the art and technology, therefore, portends a worse outcome for the defendant than that testified to at trial — one in 209,000,000 versus, now, one in 300,000,000. Thus the court is presented with a case where the testimony given at original trial was incorrect, but, if the defendant were given a new trial, the population frequency statistics would weigh even more against him, not more in his favor.
 "This court, therefore, concludes that the clerical error leading to incorrect interpretation of the population frequency statistics at trial in testimony presented to the jury was harmless error and not prejudicial to the defendant.
 "Neither does the prejudicial effect of such population frequency statistics upon the jury outweigh the probative value of such testimony. As a Georgia appellate court noted, in the Caldwell case, supra, the degree to which DNA statistical probability evidence narrows the possible perpetrators is so probative that it overrides any prejudicial effect on the jury.
 "Having applied the mandated three-prong test to both the matching DNA evidence offered at trial and the population frequency evidence offered at trial, this court concludes that the evidence was properly admitted, and that no prejudicial error occurred which entitles the defendant to a new trial."
Based on the findings of the trial court, after considering the evidence as to this matter, we find that this DNA evidence was properly admitted at trial.
AFFIRMED.
All Judges concur. *Page 615